Judith Wilder BRISKIN et al.,
Plaintiffs,

v.

ERNST & ERNST, a Co-Partnership,
Defendants.

Judith Wilder BRISKIN et al., as listed
above in Case No. 73-1345-AAH,
Plaintiffs,

v.

Newton GLEKEL et al., Defendants.

Newton GLEKEL et al., Defendants
and Third-Party Plaintiffs,

v.

AMERICAN HOME ASSURANCE
COMPANY, Third-Party
Defendant.

Nos. 73-1345-AAH, 73-1346-AAH.

United States District Court,
C. D. California.

July 3, 1975.

Dryden, Harrington & Swartz by Jacob Swartz, Miles J. Rubin and James P. Collins, Jr., Los Angeles, Cal., for plaintiffs.

Paul, Hastings, Janofsky & Walker by Oliver F. Green, Jr., and Geoffrey L. Thomas, Los Angeles, Cal., Davis, Polk & Wardwell by Robert B. Fiske, Jr., and Rhea Kemble Neugarten, New York City, for defendant Ernst & Ernst.

Glaser & Gibbs, by Robert W. Gibbs, Los Angeles, Cal., and Willkie, Farr & Gallagher by Michael B. Targoff, New York City, for Newton Glekel.

Mark Williams, in pro per.

Wayne S. Dryden, P. C., Pasadena, Cal., and Lankenau Kovner & Bickford by John C. Lankenau and Nathaniel J. Bickford, New York City, for Charles F. McDevitt.

McCutchen, Black, Verleger & Shea by G. Richard Doty, Franklin H. Wilson, Peter W. James and Christopher J. Margolin, Los Angeles, Cal., and Cadwalader, Wickersham & Taft by John J. Walsh and Edwin David Robertson, New York City, for Emanuel Alberts.

Samuel Reisman, Los Angeles, Cal., for Jerry Finkelstein.

Arthur S. Ecker, Beverly Hills, Cal., and Eugene Frederick Roth, New York City, for Harold Ross.

Manatt, Phelps & Rothberg by Brian J. O'Neill, Los Angeles, Cal., and Olwine, Connelly, Chase, O'Donnell & Weyher by James E. Tolan, New York City, for John Taeni.

Shapiro, Robin, Cohen & Posell by Edward B. Robin, Los Angeles, Cal., and D.

David Cohen, Great Neck, N. Y., for Theodore Schlissel.

Overton, Lyman & Prince by Roy M. Brisbois, Los Angeles, Cal., for American Home Assurance Co.

## DECISION AND ORDER FOR JUDGMENT

HAUK, District Judge.

Plaintiffs allege in their Third Amended Complaint,[1] Case No. CV 73–1346–AAH, and in their Second Amended Complaint, Case No. CV 73–1345–AAH, causes of action under the Securities Exchange Act of 1934 (SEA), 15 U.S.C. §§ 78a to 78hh, and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5.[2] Jurisdiction is predicated upon SEA, Section 27, 15 U.S.C. § 78aa, and the two cases have been consolidated for hearing on defendants' Motions for Summary Judgments.

In the case against defendants McDevitt, Glekel and Ross, plaintiffs allege that certain oral misrepresentations were made by said defendants in connection with a corporate reorganization transaction between plaintiffs, who owned all of the outstanding shares of W & J Sloane of Beverly Hills and Angelus Furniture Co. (hereinafter "Sloane") on the one hand and defendants, who were officers or directors of Beck Industries, Inc. (hereinafter "Beck") on the other hand. In various meetings held on October 9, 1968, October 24, 1968, November 5, 1968, and March 12, 1969, defendant McDevitt, acting as principal agent for the other defendants, allegedly made the following oral misrepresentations to induce plaintiffs to sell Sloane to defendants in exchange for Beck securities:

(1) that Beck had formulated plans to construct a nationwide chain of retail centers in which would be located certain businesses selected by Beck;

(2) that the management individuals of these businesses would be active participants in the management of the retail centers;

(3) that Beck was in a very strong financial condition;

(4) that Beck was able to and could help these businesses with their finances;

(5) that Beck was capable of implementing such plans without difficulty;

(6) that Beck was interested in learning about the Sloane operation and buying it as a possible participant in such plans;

(7) that the value of Beck's shoe inventory had a fair market value of $12,000,000, and that not more than 10% of the value of such shoes was represented by out-of-style ladies shoes;

(8) that in acquiring the ten discount stores known as Unimart, Beck had initially committed only $400,000 of its capital, and that the inventory for the stores

---

[1] Of the original nine defendants named in the Third Amended Complaint in Case No. CV 73–1346–AAH, only three remain. The following are defendants who were dismissed with prejudice by stipulation of the parties: Emanuel Alberts on February 25, 1975; John I. Taeni on March 6, 1975; Mark Williams on March 18, 1975; and Jerry Finkelstein on July 3, 1975. On March 10, 1975, the Court granted defendant Theodore Schlissel's motion for summary judgment which was entered on March 31, 1975. Defendant Bertram H. Slater was never effectively served with process. Thus, only defendants Newton Glekel, Charles F. Mc-

Devitt and Harold K. Ross remain for consideration in Case No. CV 73–1346–AAH, and defendants Ernst & Ernst in Case No. CV 73–1345–AAH.

[2] Although plaintiffs had specifically alleged a rule 10b–5 cause of action in their previous complaints in Case No. CV 73–1346–AAH, they did not do so in their Third Amended Complaint. However, since the SEA of 1934 is generally pleaded, the Court will assume, for the purpose of these motions, that a violation of rule 10b–5 is also alleged in the Third Amended Complaint.

would later require only $2,700,000 of Beck's capital;

(9) that Beck had recently completed a private placement with the Banque de Paris of 250,000 shares of Beck's common stock at a price of over $28⅞ per share; and

(10) that Beck had substantial lines of bank credit and working capital.

In their suit against Beck's accountant, Ernst & Ernst, plaintiffs allege that: "Defendant [Ernst & Ernst] indirectly induced plaintiffs to enter into the transaction aforesaid by means of reckless, careless, unskilled and grossly negligent audit, test, review and verification of said books of account, fiscal records and financial statements, with the result that . . . [the] statements contained untrue statements of material facts, omissions of material facts, deceptive and misleading financial statements representing the net worth of said BECK INDUSTRIES, INC, . . . ." [3]

Plaintiffs filed suit in both of these cases on June 13, 1973. On March 24, 1975, a consolidated hearing was held before this Court on defendants McDevitt and Ernst & Ernst's Motions for Summary Judgments. The Court, having received voluminous exhibits, affidavits, and briefs, took the matters under submission allowing the parties additional time to file supplemental briefs and affidavits, and further allowing the remaining defendants to join in the motions.

## I. FACTUAL BACKGROUND

The initial contact between Beck and Sloane occurred early in October, 1968, when Charles McDevitt met with Bernard and Irwin Greenberg at the Angelus Furniture Office. This was basically an exploratory meeting in which McDevitt described the Beck operation to the Greenbergs, including his concept of creating a fashion conglomerate, and the Greenbergs discussed the Sloane and Angelus operations as well as their interest in getting more capital in order to expand these businesses. At that time McDevitt allegedly told the Greenbergs that Beck "was in a very strong financial condition."

This initial meeting led to a meeting at the Beck offices in New York City in late October 1968 between plaintiffs Rothberg and the two Greenbergs, and defendant McDevitt and others. McDevitt again brought up his concept of a fashion conglomerate, explaining at some length the advantages that the Sloane people would have in selling their business to Beck. Among other things, McDevitt allegedly asserted that Sloane would be the leader of a furniture fashion complex within the Beck organization and that as part of Beck, Sloane would have available to it increased access to capital for expansion and access to expertise in several fields. McDevitt allegedly repeated his assertion that Beck was financially strong. The meeting ended without any business agreement being reached.

In the period before the next formal meeting between Beck and Sloane, the Sloane shareholders reached a general agreement that the sale of Sloane was desirable, but that Beck should be investigated further. Several oral inquiries about Beck were made. The first serious discussions as to the form of a merger between Sloane and Beck were held at the next meeting when McDevitt appeared before the full Board of Directors of Sloane on November 5, 1968, and the form of the transaction and the purchase price were discussed. In addition, plaintiffs allege that McDevitt said that he would expand the Sloane operation and asserted that Beck would supply the capital for expansion. In response to questions from the Sloane group concerning the size of Beck's inventory, McDevitt allegedly stated that the Beck Shoe inventory was around $12,000,000;

---

3. Plaintiffs' Second Amended Complaint, Case No. CV 73–1345–AAH, para. 6.

and that within that figure, $1,000,000 to $2,000,000 was old-age or unsaleable merchandise.

At that time Manuel Rothberg and the Greenberg brothers were appointed by the Sloane shareholders to negotiate an arrangement with McDevitt. A consensus existed that these three should carry the main responsibility in negotiating the merger.

A further meeting between McDevitt and the members of the Sloane board occurred in late November or early December 1968 in Los Angeles. By this time Beck had given the Sloane management financial information in documentary form, including: (1) the 1967 financials audited by Leidesdorf, Beck's previous accountant; (2) the proxy statement which contained the 1967 financial statements as well as an unaudited balance sheet for Beck for the period as of May 31, 1968; and (3) an informal unaudited *pro forma* forecast balance sheet as of December 31, 1968. At the meeting, McDevitt once again allegedly assured the Sloane group that Beck had readily available cash that Sloane would use for expansion.

By early December, the Beck and Sloane groups had reached an agreement in broad general terms, and in late December 1968 Bernard Greenberg and Marshall Siskin went to New York City, as representatives of the entire Sloane shareholders group, to finalize the terms of the merger and to execute a letter of intent. It was understood that Beck wanted something definite to be concluded before year-end 1968. During the negotiations Greenberg and Siskin talked on the phone to Manuel Rothberg and Irwin Greenberg, and on December 31, 1968 they signed a binding letter of intent on behalf of all Sloane shareholders.

The Sloane shareholders did not condition their willingness to proceed on any review of Beck's records and books, nor did they require that consummation of the transaction be put off until audited Beck financials for 1968 were available. On the contrary, both Bernard Greenberg and Siskin, who negotiated the letter of intent, anticipated that the transaction might close in as little as 30 days. A closing within that time period would precede the issuance of the formal auditors' report.

When the letter of intent was signed, the Sloane management group thought that everything important had been done and any further negotiations that might be necessary were to be handled by Manuel Rothberg. But small problems arose and the negotiations dragged on.

Then in March 1969 a major problem arose. Manuel Rothberg discovered in a trade publication that Beck planned to acquire a group of Unimart stores from Vornado, Inc., and reopen them under the name of Beck's subsidiary, Disco-Fair. Rothberg immediately called a meeting of Sloane's management group to discuss the Unimart problem. The Sloane people were primarily concerned about how Beck proposed to finance the acquisition of Unimart and whether the acquisition would drain large amounts of Beck's available cash. Additionally, they were alarmed because Unimart did not appear to have the high fashion image that McDevitt had said Beck was trying to build, the real estate locations of several Unimart stores were not desirable, and Unimart had labor problems. Moreover, they were determined to call off the deal unless satisfactory answers to their concerns could be provided. Thus, on March 12, 1969—the very next day—Rothberg and Bernard Greenberg flew to New York to meet with McDevitt.

At the meeting in New York, Rothberg and Greenberg questioned McDevitt about the Unimart transaction. The principal questions concerned the financing of the deal. McDevitt allegedly answered these questions, and also suggested they meet with Sidney Moray, head of Disco-Fair. Throughout their negotiations, McDevitt expressed his willingness to provide them with whatever information they wished.

Rothberg and Greenberg were satisfied with the answers that McDevitt gave them and believed Beck had arrived at a method of financing the acquisition without overly extending itself. While there are several versions of what McDevitt told Rothberg and Greenberg, the key factor throughout the plaintiffs' different versions is that the Sloane people believed they had been assured that the transaction would not require Beck to put any more than approximately $3,000,000 into the Unimart stores over the next several years. They claim that McDevitt further told them that Beck had no liability with respect to the ten store leases being acquired. On this basis Greenberg and Rothberg subsequently left New York with the impression that the Unimart transaction was beneficial, and they decided not to cancel the sale of Sloane to Beck.

McDevitt allegedly also discussed at this meeting the private placement of approximately 250,000–260,000 shares of Beck stock. McDevitt told them he could not reveal the exact price until after a filing with the Securities and Exchange Commission (SEC), but that the shares were placed with the Banque de Paris and Credit Suisse at a price of something over $28⅞ per share. He added that the exact price would be revealed in the filing with the SEC. In addition, McDevitt allegedly made a definitive statement about expanding Angelus Furniture Co.

Following Rothberg and Greenberg's return to Los Angeles, the Sloane group did not do any extensive research on Unimart. They also did not check Beck's SEC filing as to the price of the shares to be placed privately in Europe.

After the meeting regarding Unimart, some Sloane shareholders received Beck's 1968 Annual Report dated March 27, 1969, containing Beck's 1968 financial statements as formally audited by defendant Ernst & Ernst. After having read these financial statements, which showed a decrease of about 14% in net worth as well as an approximate 12%

decrease in inventory from the unaudited *pro forma* projections upon which the terms of the transaction had been negotiated, none of the Sloane shareholders protested in any way or made the slightest suggestion that any of the terms of the merger transaction be renegotiated.

Beck and Sloane finally closed the deal on September 26, 1969 in a document that is basically a restatement of the agreement that had been earlier finalized on June 4, 1969 to reflect the change from a common stock to a preferred stock transaction. A study of this document shows a great disparity in the representations that the two companies made to each other. Although Sloane made certain specific guarantees regarding its representations, Beck gave no equivalent guarantees. Beck's sole representation is contained in Paragraph 5, and, in effect, warrants only that Beck's actions in regard to the merger are valid corporate actions. The agreement also contains an integration clause, making this Restated Agreement "the entire final agreement" containing "all the agreements, covenants, representations and warranties of Beck."

Finally, at a meeting on July 11, 1970 at the Biltmore Hotel in New York—a date plaintiffs refer to as "Pearl Harbor Day"—at which were present the Beck management, a number of attorneys and a large group of representatives of former shareholders of corporate acquisitions, including Manuel Rothberg and Bernard Greenberg representing the former Sloane shareholders, McDevitt announced that the debenture financing and offering would not go forward. And the Beck management admitted that they were considering filing for bankruptcy. Beck ultimately filed for bankruptcy on May 27, 1971.

## II. THE STATUTE OF LIMITATIONS

Defendants urge that their Motions for Summary Judgments be granted on the ground that the statute of limitations has run on plaintiffs'

claims in that plaintiffs were aware, or should have been aware, prior to June 13, 1970, of defendant McDevitt's alleged oral misrepresentations, but failed to file the original complaints in the within actions until June 13, 1973. It is conceded by all the parties that in the absence of a Federal statute, the applicable statute of limitations is three years as set forth in Cal.Code Civ.Proc. § 338(4), for securities fraud (SEC) cases arising in this state. *See United California Bank v. Salik,* 481 F.2d 1012 (9th Cir. 1973), *cert. denied* 414 U.S. 1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1973). It is well established in California that an action predicated on fraud begins to run as soon as the aggrieved party discovers either facts constituting fraud or facts sufficient to make a reasonably prudent person suspicious of fraud, thus putting him on notice. *Boeseke v. Boeseke,* 31 Cal.App.3d 462, 107 Cal.Rptr. 353, 358 (1973); *Hobart v. Hobart Estate Co.,* 26 Cal.2d 412, 437, 159 P.2d 958 (1945); *Tognazzini v. Tognazzini,* 125 Cal.App. 2d 679, 271 P.2d 77 (1954).

Moreover, as the Court stated in *Tognazzini, supra* at 687, 271 P.2d at 82:

"If the means of knowledge exist and the party is aware of facts which would make a reasonably prudent person suspicious, it will be held that there was knowledge of what could have been readily ascertained by such inquiry. In other words, under such circumstances means of knowledge are equivalent to knowledge."

Plaintiffs, therefore, once having actual notice or reasonable suspicion of the falsity of the representations made, must exercise due diligence and reasonable care in flushing out the facts which would disclose the fraud. The statutory period "[does] not await [plaintiffs'] leisurely discovery of the full details of the alleged scheme." *Klein v. Bower,* 421 F.2d 338, 343 (2d Cir. 1970); *see also National Automobile and Casualty Insurance Co. v. Payne,* 261 Cal.App.2d 403, 67 Cal.Rptr. 784, 787 (1968). We think there are more than sufficient facts present here, when considered in view of the other factors discussed *infra,* to conclude that plaintiffs had ample notice and grounds for reasonably prudent suspicions well before June 13, 1970, that a fraud had been committed upon them by defendants, even when considering all the alleged facts in the light most favorable to plaintiffs. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Griffeth v. Utah Power Light Company,* 226 F.2d 661, 669 (9th Cir. 1955).

The "flexible duty standard," as recently established by the Ninth Circuit in *White v. Abrams,* 495 F.2d 724 (9th Cir. 1974), must be applied in these SEC alleged fraud and misrepresentation cases. The Court held that there could be no liability without fault, and urged that the traditional, compartmentalized approach—such as the vague and confusing "scienter" requirement—be discarded in favor of a more flexible standard variable with each set of facts. The relevant factors to be considered were stated by the Court as follows:

"... the relationship of the defendant to the plaintiff, the defendant's access to the information as compared to the plaintiff's access, the benefit that the defendant derives from the relationship, the defendant's awareness of whether the plaintiff was relying upon their relationship in making his investment decisions and the defendant's activity in initiating the securities transaction in question." *Id.* at 735–736.

More recently, the Ninth Circuit, expanded upon the factors to be considered in *L. S. Robinson v. Cupples Container Co.,* 513 F.2d 1274, at 1277 (9th Cir. 1975) as follows:

"Where the representation in question is a promise of one of the parties, the representation must be viewed in the light of the relationship of the parties, the context in which the statement was made, the experience and bargaining position of the investor

and the nature of the transaction as well as the character of the underlying fact."

*See also Taylor v. Smith, Barney & Co., Inc.,* 358 F.Supp. 892, 895 (D.Utah, N. D. 1973).

With these standards in mind, we turn to the facts which warned or reasonably should have warned plaintiffs that fraudulent statements and misrepresentations were made by defendants long prior to June 13, 1970.

Within a relatively short period of time following the closing of the Beck-Sloane merger in September 1969, events transpired clearly indicating that all at Beck was not as plaintiffs allegedly were promised. No later than June 8, 1970, and certainly before June 13, 1970, the following had occurred:

(1) Beck never made any cash available to Sloane for expansion;

(2) the proposed Glore Forgan common stock financing, which the Sloane group recognized as important to the future of Beck, fell through;

(3) Beck put out a preliminary prospectus dated May 4, 1970, with audited financial statements as of December 31, 1969, indicating that Beck intended to pledge the stock of its subsidiaries to secure a line of credit;

(4) Beck failed to pay a preferred stock dividend of $110,000 due the Sloane shareholders as of June 1, 1970;

(5) no seat on the Beck Board of Directors was forthcoming for Sloane;

(6) no representative of Sloane was made head of the furniture group;

(7) Beck common stock suffered a dramatic decline; and

(8) the June 9, 1970 issue of Women's Wear Daily carried a story revealing that Beck was suing for rescission of one of its acquisitions, and that the acquired company was cross-claiming on the grounds of alleged fraudulent misrepresentations made to it by Beck.

■ It is clear that the parties intended the Restated Agreement executed on September 26, 1969, to be "the entire final agreement" containing "all the agreements, covenants, representations and warranties of Beck." Beck's refusal to extend any specific or even general warranties to plaintiffs came about because McDevitt told plaintiffs that Beck filed public statements with the SEC and furnished annual reports and various prospectuses, to which plaintiffs had full access. These documents, all of which were available to plaintiffs, were alone enough to put plaintiffs on notice of the falsity of McDevitt's representations if they had truly relied upon them. However, other facts were also present, and we need discuss only some of them, which should have put plaintiffs on notice that the alleged fraud had been committed.

### A. Beck's Capital Shortage

Plaintiffs were aware from the outset of Beck's rapidly increasing short term debt. The October 1968 proxy material indicated that from May 31, 1968, to December 31, 1969, Beck's short term debt grew by 900% from $1,500,000 as of May 31, 1968, to $13,400,000 by year-end 1968. Moreover, that debt continued to increase throughout the negotiation period. By September 19, 1969, as shown by the October 22, 1969 prospectus which plaintiffs received, Beck's short term debt had increased by another 250% to $33,330,000.

Indeed, the 1969 Annual Report of Beck, as audited and certified by defendant Ernst & Ernst, dated April 13, 1970, showed a 1000% increase in long term debt from the previous year (1968)—$3,000,000 to $30,000,000—and a 100% increase in current liabilities—$40,000,000 to $80,000,000. Moreover, the 1968 Annual Report of Beck, again

as audited and formally certified by defendant Ernst & Ernst, dated March 27, 1969, showed an increase of current liabilities of approximately 230% over the previous year (1967).

Such a severe capital shortage and heavy indebtedness, both current and long term, caused Beck to refuse to provide the $2,300,000 cash payment provided for in the common stock deal originally negotiated with Sloane and resulted in the Restated Agreement calling for exchange of Beck preferred stock instead of common stock. Moreover, this capital shortage prevented Beck from supplying expansion capital to Sloane as McDevitt allegedly promised. No such expansion capital was ever provided to Sloane.

**B.** *Dramatic Decline in Beck Stock*

In February 1969, Beck stock sold at its high of $42.50 per share; by May 18, 1970, the price had fallen to $6.00 per share, a decline of over 85%. As the Court stated in *Hupp v. Gray*, 500 F.2d 993, 996 (7th Cir. 1974):

"The sharp fall in the market price was not a concealed fact but, rather, was clearly and painfully revealed to the plaintiff. At the very least, these circumstances should have aroused suspicion or curiosity on the part of plaintiff."

Plaintiffs seek to distinguish *Hupp*, arguing that there plaintiff was sold common stock with the representation that the market would rise, whereas in the instant case, plaintiffs obtained Beck preferred stock at a guaranteed selling price or an option to convert to common. Therefore, plaintiffs contend they did not concern themselves with the state of Beck common on the market. Moreover, plaintiffs point out the general decline in the market as a whole during this period. We find plaintiffs' explanations unsatisfactory for three reasons.

First, plaintiffs claim in their Complaint that McDevitt made misrepresentations that Beck was in "strong financial condition," but they nevertheless chose to ignore the facts indicating otherwise. The dramatic decline in Beck common, a fact which plaintiffs were or should have been aware of, clearly showed that the overall financial health of Beck was in jeopardy.

Second, plaintiffs had an option to convert their preferred shares of Beck stock for common stock, and it would be unreasonable to conclude that a shareholder in this situation would ignore the happenings on the stock exchange.

And, third, the fact that the market was suffering from a general decline also should have alerted the Sloane plaintiffs to the inherent risks of their merger venture with Beck. Investments always involve risks, and plaintiffs, once having ignored this ominous sign and having settled instead for the comforting words of McDevitt, cannot later claim fraud when events took the unfortunate turn which plaintiffs should have anticipated.

Furthermore, Jack Wilder, one of the principal shareholders of Sloane to whom plaintiffs assigned the task of analyzing Beck's financial statements, made his considered reservations about Beck's financial condition very clear to plaintiffs and their representatives. Wilder refused to accept his share of the negotiated preferred Beck stock, and as a result, Sloane real estate was "spun off" to him as his part of the transaction. He also stated to plaintiff Bernard Greenberg that one of the reasons he refused Beck preferred "was his suspicion of the quality of Beck stock."

Wilder was not the only one who was concerned about Beck's condition. After reviewing the May 4, 1970 prospectus, Aaron Eshman, financial advisor to those plaintiffs who belong to the Siskin family, clearly warned plaintiffs of Beck's grave financial problems. He told plaintiff Bernard Greenberg on May 12, 1970, that Beck had "alarming debt" and a "bad liquidity problem." Plaintiff Siskin, who read the May 4, 1970 prospectus when it was issued, ad-

mitted that he realized Beck had "an increasing need for cash," that the information was "adverse" and strongly affirmed that he would not have entered into the transaction with Beck if Beck had been burdened in September 1969, with the current liabilities shown in the prospectus of May 4, 1970.

### C. *The Missed Dividend*

Against this background of a dramatic decline in Beck's common stock and Beck's alarming current and long term debt, more bad news came to the attention of plaintiffs. This should have prompted them to act forthwith in bringing suit if fraudulent misrepresentations had indeed been made to them by defendants. On June 1, 1970, Beck was obligated to pay plaintiffs a quarterly dividend of more than $115,000 on the preferred stock issued to them. That dividend was not paid when due, causing plaintiffs much concern. On June 5, 1970, plaintiff Rothberg called McDevitt to learn why the dividends had not been paid. In McDevitt's absence, Rothberg spoke with Mark Williams, Secretary and Corporate Counsel of Beck. Williams informed him that the dividend would be paid *after* the proposed debenture offering was successfully completed and confirmed this information to Rothberg by letter that day with copies sent to all the plaintiffs. Plaintiffs then held a meeting at plaintiff Bernard Greenberg's office on June 12, 1970, to discuss the missed dividend and apparently were satisfied with Williams' explanation, and, as a result, they failed to file suits until after three years had expired.

As the Court stated in *Nighbert v. First Nat. Bk. of Bakersfield,* 26 Cal. App.2d 624, 635, 79 P.2d 1105: " . . . the cessation of dividends [would] naturally call for some inquiry on the part of the stockholders as to what was the condition of the corporation . . . ." However, as with the

facts of the decline of Beck common, the shortage of capital and the heavy debt structure, plaintiffs still ignored the writing on the wall and settled instead for empty dreams and idle hopes. Plaintiffs' reliance on Beck's explanations is similar to that found in *Hupp v. Gray, supra* at 997, where plaintiff alleged that he was "lulled into a sense of security" and "deterred from suspecting that fraud had been perpetrated upon him." The Court rejected this claim concluding, as we do in the case at bar, that defendants had not concealed the facts "which would have put a reasonable person on notice of the possibility of fraud."

### D. *The Unimart Transaction*

The Sloane plaintiffs also had sufficient notice regarding McDevitt's misrepresentations about Beck's acquisition of the ten discount stores known as Unimart. Plaintiffs allege in their Third Amended Complaint that they were concerned about the acquisition of the Unimart stores in March 1969.[4] Plaintiffs contend, however, that McDevitt allayed their concern by allegedly telling plaintiffs Rothberg and Bernard Greenberg at the March 12, 1969 meeting in New York that only $3,000,000 of Beck capital would be needed to finance the Unimart acquisition.[5] In fact, Beck assumed liability on all the Unimart leases as stated six months before the Beck-Sloane closing in the 1968 Beck Annual Report dated March 27, 1969. Beck's prospectuses of October 22, 1969 and May 4, 1970 reiterated that Beck had the Unimart "leasehold interest."

Beck's liability on the Unimart leases resulted in a lawsuit for $2,000,000 brought against Beck for past due rent. News of this lawsuit was published in the June 3, 1970 issue of the trade paper, *Home Furnishings Daily,* which was received by three of the plaintiffs. Plaintiff Rothberg, after seeing the article, phoned plaintiff Bernard Green-

---

4. Plaintiffs' Third Amended Complaint, Case No. CV 73–1346–AAH, para. 15.

5. *Id.* at para. 17(a).

berg's office to arrange a meeting regarding the matter, and one was held on June 12, 1970 although no plan of action was adopted. Even assuming as we do for the purpose of these motions, that McDevitt's representations on the amount of Beck capital required for the Unimart acquisition were excessively low, we must conclude that plaintiffs had ample notice, both prior and subsequent to the Beck-Sloane closing in September 26, 1969, to inquire further about the details of the Unimart transaction. In fact, McDevitt himself told plaintiffs to "meet [Sidney] Moray," the head of Disco-Fair, if they had any further questions about the Unimart acquisition. If plaintiffs had more fully informed themselves following their initial concern over the Unimart transaction, which they admit in their Third Amended Complaint, both Beck's liability on the Unimart leases and McDevitt's underestimation of the amount of capital required would have become resoundingly clear.

### E. *The Private Offering of Beck Common stock*

Finally, plaintiffs allege that in March 1969, McDevitt told both Rothberg and Bernard Greenberg that Beck had privately sold over 250,000 shares of its common stock for more than $28⅞ per share. Having been put on notice that a private offering had been made, plaintiffs once again settled for McDevitt's "puffing" rather than the not-too-difficult search for the truth. The fact that the stock sold for $25 per share was contained in Beck's prospectuses of October 22, 1969, May 4, 1970, May 21, 1970 and June 5, 1970. Beck's 1969 Annual Report dated April 13, 1970, also disclosed the selling price of $25 per share.[6] McDevitt also told plaintiffs that the "8-k [filing] will disclose" the exact price of the private placement. And lastly, the June 1, 1970 issue of *Forbes* magazine also reported that Beck's private placement had gone "sour."

Thus, we feel compelled to conclude that the dramatic decline in Beck common, the shortage of Beck capital, the missed dividend, Wilder's actions, Eshman's advice, the Unimart transaction and the private placement of Beck common stock were all sufficient to put a prudent investor on notice that Beck was neither in "a strong financial condition" nor capable of providing expansion capital for Sloane.

### III. THE GENERAL NATURE OF THE TRANSACTION

In concluding as we do that the applicable statute of limitations has run in both these actions, we have considered all of the facts of this case in light of the guidelines laid down both in *White v. Abrams, supra,* 495 F.2d at 735-736, and in *Cupples Container, supra,* at 1277, and find that when "the experience and bargaining position" of plaintiffs as well as "the nature of the transaction" are considered, the case against plaintiffs here is overwhelmingly persuasive. Had plaintiffs been novice investors or businessmen, or had the defendants in any way concealed, or attempted to conceal, facts which would have revealed the falsity of the representations made, the result here would perhaps be different.

However, all of the plaintiffs before us are experienced businessmen or lawyers, or both, who conducted intensive, thorough negotiations which extended for almost a year and culminated in the Beck-Sloane merger on September 26, 1969. Plaintiff Rothberg, who is both an attorney and businessman, had had 22 years of business experience at the time the negotiations with Beck were commenced in October 1968. Plaintiff Bernard Greenberg was and is a senior partner in a prominent Beverly Hills law firm, and he had long specialized in in-

---

**6.** This $25 per share selling price is easily and readily computed by dividing the dollars received on the sale by the number of shares sold.

come tax and corporate matters when the Beck negotiations were commenced. Both of these men acted as agents for all the other plaintiffs, who were and are a close-knit family group. All the plaintiffs as a group of relatives, by blood or by marriage, delegated the responsibility for negotiating and concluding the Beck agreement to plaintiffs Rothberg and Bernard Greenberg, and to a lesser extent, to Irwin Greenberg and Marshall, Leo and Sheldon Siskin. Collectively, these six plaintiffs hold four law degrees, two degrees in business administration and one degree in finance, and possess over 90 years of combined business and legal experience. Plaintiffs also had the benefit of a team of expert legal, financial and business advisors throughout the negotiations.

■ The supposedly high degree of faith and trust in McDevitt's representations that this experienced group claims to have relied upon defies credulity when the undisputed facts are considered, showing the amount of information available to plaintiffs prior to June 13, 1970. Plaintiffs have not refuted defendants' argument that the facts discussed, *supra*, were enough to excite their reasonable suspicion and put them on actual, or at least constructive, notice of the alleged fraud. Nor have plaintiffs contended in their opposition to defendants' motions that McDevitt, Ernst & Ernst, or any other defendant, ever deliberately or even inadvertently concealed or attempted to conceal any of the information which would have revealed the truth or falsity of the alleged representations. We must conclude that plaintiffs had either actual or, perhaps in some instances, at least constructive knowledge of the existence of this

information.[7] *Crabbe v. White*, 113 Cal.App.2d 356, 359–360, 248 P.2d 193 (1952) ; *Security First National Bank v. Ross*, 214 Cal.App.2d 424, 431, 29 Cal. Rptr. 538 (1963) ; *Morgan v. Koch*, 419 F.2d 993, 998 (7th Cir. 1969). The actual or constructive knowledge attributable to the six plaintiffs acting as agents, for all the plaintiffs—namely Rothberg, the Greenbergs and the Siskins—is imputed to all of the remaining plaintiffs. *Columbia Pictures Corp. v. DeToth*, 87 Cal.App.2d 620, 630, 197 P.2d 580 (1948). We must also conclude that the uncontroverted facts clearly demonstrate that all the plaintiffs had "actual or constructive notice," and certainly "reasonable suspicion," of any falsity of any representations made, and failed to exercise due diligence and reasonable care in discovering the facts which would disclose the existence of any fraud.

In applying the "flexible duty standard" as set out in *White v. Abrams, supra*, 495 F.2d at 735–736, to the facts of this case, we conclude that defendants, including the outside auditors Ernst & Ernst, were without fault and fully complied with their duty to make available to these experienced plaintiffs all information which would disclose the true financial state of Beck, and further that the defendants, including Ernst & Ernst, did so, well prior to June 13, 1970. Furthermore, we conclude that reasonable and experienced investors, such as the plaintiffs before us, could not and would not have reasonably relied upon the alleged misrepresentations made in light of the facts existing prior to June 13, 1970, but, in the exercise of due care and diligence, could have and would have sought out those facts. *City National Bank of Fort Smith, Ark. v.*

---

**7.** It cannot be disputed that Beck made extensive filings with the SEC through 1968–1970. These filings included two Registration Statements each dated July 17, 1969, one for the public underwriting of Beck's common stock and the other covering stock to be issued in subsequent acquisitions. A review of these SEC filings, as well as those filed with the American Stock Exchange, show, for example, that the price of the privately placed common stock was $25 per share rather than $28⅞ per share, and further set forth the terms of Beck's agreement with Vornado, Inc., including its obligations on the Unimart leases. These filings were always available for plaintiffs' inspection.

*Vanderboom,* 422 F.2d 221, 230 (9th Cir. 1970), *cert. denied,* 399 U.S. 905, 90 S. Ct. 2196, 26 L.Ed.2d 560 (1970).[8]

It is also worth noting that in August 1970, a month after Beck announced that its debenture offering had failed, a series of meetings were held which led to the election of plaintiff Rothberg as Chief Executive Officer and Chairman of the Board of Directors of Beck. On September 17, 1970, at a Beck Directors meeting, plaintiff Rothberg stated that all of the plaintiffs "except Judy Wilder [Briskin] have agreed to waive all claims, causes of action and demends for rescission arising from or relating to the agreement pursuant to which the Corporation acquired all the capital stock of [Sloane]." As plaintiff Rothberg stated in his Affidavit filed on March 25, 1975 in opposition to defendants' motions, at pages 8–9 thereof: "We [plaintiffs] attempted to reorganize BECK by spinning off its unprofitable companies and paring it down to a viable core of solid companies. BECK'S debt situation was too great, however, and bankruptcy could not be avoided."

The plaintiffs, therefore, chose to salvage Beck rather than filing suit. Such action is not indicative of investors who allegedly were "stunned" by the news of Beck's financial collapse on July 11, 1970—a day that plaintiffs also claim they first became aware of the falsity of McDevitt's representations. Such dalliance brings to mind the caveat stated in *Royal Air Properties, Inc. v. Smith,* 312 F.2d 210, 213–214 (9th Cir. 1962):

"The purpose of the [SEA] is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act."

Finally, plaintiffs have opposed defendants' motions by arguing that the question of the reasonableness of plaintiffs' reliance on McDevitt, as well as the question of the running of the statute of limitations, is a material issue of fact which should be resolved at trial. However, in the numerous affidavits submitted by plaintiffs in opposing these motions, not one controverts the fact that the information which would have revealed the truth or falsity of McDevitt's representations was always available to plaintiffs. Furthermore, plaintiffs have not denied that after an extended, arm's-length negotiation period, an agreement was reached with Beck which contained neither references to McDevitt's representations nor references to the type of warranties that Sloane unilaterally extended to Beck. This irrefuted fact alone should have alerted plaintiffs to the inherent risks of the transaction as well as the proper credence to be accorded to McDevitt's representations. We therefore hold that there are no material issues of fact and that the defendants are entitled to summary judgments as a matter of law.

It follows that all of the defendants' cross-claims are moot and therefore should be dismissed with prejudice.

By reason of the foregoing decision which shall constitute the Findings of Fact and Conclusions of Law required by Rule 52, Federal Rules of Civil Procedure, it is hereby ordered that the defendants' motions for summary judgments be granted.

Let judgment be entered accordingly.

---

8. *See also* Comment, Negligent Misrepresentations Under Rule 10b–5, 32 U.Chi.L.Rev. 824, 841–42 (1965) cited in *Vanderboom* with approval at 230, n. 10 where the author states the following:

"Not only should the plaintiff have to prove that he relied on the defendant's statements, but he must convince the trier of fact that his reliance was reasonable under all the circumstances at the time. In this way recovery would be denied to those who, because of their 'business sophistication,' acumen, or ready access to the information involved, could reasonably be expected to exercise a higher degree of care and investigation in their dealings."